[Cite as *State v. Leigh*, 2023-Ohio-91.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 28821 |
| | : | |
| v. | : | Trial Court Case No. 18-CR-3087 |
| | : | |
| BRANDON WILLIAM LEIGH | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 13, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

MICHAEL T. COLUMBUS, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} After being bound over from juvenile court, Appellant Brandon William Leigh was found guilty after a jury trial of murder, involuntary manslaughter, and improperly discharging a firearm at or into a habitation. Each of those charges included a firearm specification. In addition, the trial court found him guilty following a bench trial of having weapons while under disability. The court sentenced Leigh to an aggregate term of 30 years to life in prison and ordered him to pay restitution.

{¶ 2} Leigh appeals from his convictions, raising five assignments of error. He argues that (1) the trial court committed reversible error by admitting a witness's probable cause hearing testimony; (2) the trial court committed reversible error by allowing testimony that Leigh sent messages via Facebook Messenger, which contained hearsay and discussed other bad acts; (3) defense counsel rendered ineffective assistance; (4) cumulative error deprived Leigh of a fair trial; and (5) the State failed to prove all of the elements of the charged offenses. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 3} According to the State's evidence at trial, at approximately 8:20 p.m. on February 16, 2018, multiple gunshots were fired into the rear of the home of Jacqueline Mooty, located at 122 Lorenz Avenue in Dayton. The shots came from an alley behind the home. When the shooting occurred, Mooty was home with her boyfriend, her six children (ranging in age from 6 to 22 years old), her two-year-old granddaughter, and others. Keyona Murray, Mooty's 22-year-old daughter, was shot in the head in Mooty's

first-floor rear bedroom.   Keyona, who was approximately 11-weeks' pregnant, died from her injuries at the hospital.

{¶ 4} The main issue at trial was the identity of the shooter.   One of Keyona's brothers, Marrico Murray, testified that he had met Leigh through his (Marrico's) close friend, Shareef Tillman.   Marrico communicated with Leigh using Facebook Messenger, where Leigh used the profile name "Brando So Humble."   On February 14, 2018, while Marrico, Tillman, and Leigh were together, Leigh showed the others his 9mm handgun. Marrico testified that Tillman put the gun in his pocket and left with it.   Believing that Marrico had stolen the gun, Leigh then sent Marrico a series of messages that Marrico interpreted as warnings to return the gun.   On February 15, 2018, the day before the shooting, Marrico received a final message from Leigh, indicating "it's on now," as Marrico interpreted it.

{¶ 5} Marrico did not immediately identify Leigh as a suspect to the police.   After additional questioning several days following the shooting, Marrico showed the Facebook messages to detectives.   During the investigation, Detective Zachary Farkas obtained additional Facebook messages between Leigh and several other individuals in which Leigh discussed getting robbed and his efforts to locate Marrico.

{¶ 6} Two additional State's witnesses connected Leigh to the shooting.   Aleea Lee, who thought of Leigh as a son, testified that, at approximately 7:30 to 8:00 p.m. on the night of the shooting, she drove Leigh to a recreation center near Third Street and James H. McGee Boulevard.   Between 8:30 and 8:45 p.m., Leigh asked to be picked up at the intersection of Oakridge Drive and Gramont Avenue, a location near 122 Lorenz

Avenue.

{¶ 7} Angela Williams, who had lived at Lee's home with her girlfriend, stated that a few days prior to the shooting, she overheard a conversation between Leigh and others where Leigh spoke about "needing to get his sh*t back." Williams stated that Leigh was referring to a pistol. Williams also heard Leigh talk to his sister on the telephone about meeting so that he could get another gun; he stated he needed it to get his property back. Leigh had left shortly after the conversation with his sister. A few days after the shooting, Leigh asked Williams if she had heard what had happened. When Williams asked Leigh if he had something to do with it, Leigh told her that he was there and "did it."

{¶ 8} During the afternoon of February 23, 2018, a week after the shooting, the police went to Lee's home and arrested Leigh. Before the police arrived at the house, Lee and Leigh saw a detective drive by in a truck. Leigh said to Lee, "I'm about to go to jail."

{¶ 9} Leigh was 17 years old when the shooting occurred. Upon his arrest, he was charged by complaint with murder in juvenile court. On April 3, 2018, the State filed an amended complaint adding charges of involuntary manslaughter and improper discharge of a firearm at or into a habitation, each with firearm specifications, as well as having weapons while under disability. It further sought to have the matter transferred to adult court. On August 3, 2018, the juvenile court conducted a probable cause hearing during which four witnesses testified, including Angela Williams. The juvenile court found that there was probable cause to believe that Leigh was responsible for the offenses, and it ordered the case transferred to the general division of the common pleas

court. On August 31, 2018, Leigh was indicted for murder, involuntary manslaughter, and improper discharge of a firearm at or into a habitation, each with a firearm specification. He was also indicted for having weapons while under disability.

{¶ 10} In March 2020, the matter proceeded to a bench trial on having weapons while under disability and a jury trial on the remaining charges and specifications. The State presented 13 witnesses and approximately 100 exhibits. Williams did not appear for trial as required by subpoena, and the police were unable to locate her. The court found that she was an unavailable witness, and it permitted an audio-recording of her probable cause hearing testimony to be played for the jury.

{¶ 11} Leigh testified on his own behalf. He denied having a disagreement with Marrico, sending all the Facebook messages that were presented at trial, and knowing where Marrico lived. He stated that he had stopped using his "Brando So Humble" account prior to February 2018. Leigh further testified that Lee did not take him to the recreation center on February 16. He stated that he went to school that day, that Lee picked him up and took him to her home, and that his mother picked him up around 8:30 p.m. and took him home. Leigh denied that he had committed the shooting, that he had admitted to Williams that he did it, and that he had said that he was going to jail on February 23. Leigh claimed that he had never been to 122 Lorenz Avenue.

{¶ 12} At the conclusion of the trial, Leigh was found guilty of all charges and specifications. At sentencing, the trial court imposed an aggregate sentence of 30 years to life in prison and ordered Leigh to pay restitution.

{¶ 13} Leigh appealed from his convictions. His original appellate counsel filed a

brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), stating that he could find no non-frivolous issues for appeal and requesting leave to withdraw.   Upon our initial review, we noted that the record was incomplete, making the filing of an *Anders* brief inappropriate.   We further commented that we were "troubled by the filing of an *Anders* brief when the case involves a direct appeal from a conviction on murder charges following a jury trial.   It should be the truly rare case where counsel finds no non-frivolous issues for review in such an appeal."   We emphasized that the phrases "wholly frivolous" (the standard for an *Anders* brief) and "not meritorious" are not synonymous, and that an *Anders* brief is not appropriate based on appellate counsel's determination that the defendant is not likely to prevail on appeal.   Finally, we concluded that at least one non-frivolous claim existed, including whether the convictions were against the manifest weight of the evidence and whether the trial court erred in various evidentiary rulings.   We therefore set aside the *Anders* brief and appointed new counsel for Leigh.

{¶ 14} Leigh, with new counsel, now raises five assignments of error, which we will address in an order that facilitates our analysis.

## II. Weight and Sufficiency of the Evidence

{¶ 15} In his fifth assignment of error, Leigh claims that the State failed to prove that he discharged a firearm at a house, a key element of all his convictions.   He states: "[N]o one testified that Appellant ever possessed a firearm after Marrico took his. Additionally, if he discharged a firearm in the neighborhood, no testimony established that he did so with an awareness that a bullet would hit a house."   Leigh argues that, because

the State failed to present evidence that he improperly discharged a firearm at or into a habitation, all his convictions were based on insufficient evidence and against the manifest weight of the evidence.

**A. Standards for Sufficiency and Manifest Weight of the Evidence**

{¶ 16} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 17} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 18} We recognize that, in other assignments of error, Leigh challenges the trial court's admission of certain evidence, including the Facebook messages and Williams's probable cause hearing testimony. However, when reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all the evidence admitted at trial, regardless of whether it was admitted erroneously. *See State v. Fleming*, 2d Dist. Clark No. 2021-CA-40, 2022-Ohio-1876, ¶ 27, citing, *e.g., State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284. Accordingly, we must consider all the State's evidence in conducting our analysis.

### B. Improper Discharge of a Firearm at or into a Habitation

{¶ 19} Improper discharge of a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1), was the predicate offense for Leigh's murder and involuntary manslaughter charges. In challenging his convictions, he therefore focuses on the sufficiency of the State's evidence in support of that predicate offense.

{¶ 20} R.C. 2923.161(A)(1) provides that "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.]" An "occupied structure" is defined, in part, as a house or building, "occupied as the permanent or temporary habitation of any person, whether or not any person is actually present." R.C.

2909.01(C). "[A] violation of R.C. 2923.161(A)(1) occurs when an offender fires a gun into someone's habitation, regardless of the presence of people." *State v. Lambert*, 2d Dist. Montgomery No. 28655, 2021-Ohio-17, ¶ 59, quoting *State v. Grayson*, 2017-Ohio-7175, 95 N.E.3d 1025, ¶ 8 (8th Dist.).

{¶ 21} In this case, there was substantial evidence that multiple bullets were fired into 122 Lorenz Avenue, Mooty's occupied residence. Lights were on inside the home, and two vehicles were parked in the driveway. Mooty, Cedric Smith (Mooty's boyfriend), and Marrico each testified to several people having been inside the home when the shooting occurred. Several occupants of the home, including Mooty, Smith, and Marrico, heard gunshots coming from behind the house. Keyona was shot and killed by a bullet that penetrated the wall of the first-floor rear bedroom.

{¶ 22} Evidence technician Ronald Christoffers testified that he located two bullet holes in the plywood covering the window to that bedroom, two bullet holes in the upstairs rear bedroom, and an additional bullet hole in the upstairs rear bathroom wall. He traced the path of travel for those bullets, and three .45 caliber bullets were recovered from inside the home; a fourth bullet that entered the rear bathroom, which stopped inside a wall, was not retrieved. An additional bullet was recovered during Keyona's autopsy. Seven spent Winchester .45 caliber bullet casings were discovered in the alley behind the residence. (An additional spent bullet was found in the alley, but it was weathered and appeared to be unconnected to the shooting.)

{¶ 23} The State was required to prove that the shooter acted knowingly. "A person acts knowingly, regardless of his [or her] purpose, when he [or she] is aware that

his [or her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Hypes*, 2d Dist. Clark No. 2018-CA-110, 2019-Ohio-4096, ¶ 21, quoting State v. Fox, 2018-Ohio-501, 106 N.E.3d 224, ¶ 14 (10th Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2d Dist. Montgomery No. 27802, 2018-Ohio-3506, ¶ 16.

{¶ 24} "The shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly." *State v. Gregory*, 90 Ohio App.3d 124, 131, 628 N.E.2d 86, 91 (12th Dist.1993). In this case, the State's evidence established that the shooter fired at least seven bullets toward Mooty's occupied residence. Five bullets struck the home and entered both the first and second floors of the residence. Given the number of bullets fired, the location from which they were shot, and the number and location of the bullet strikes, the jury reasonably concluded that the shooter acted knowingly when firing at Mooty's residence.

{¶ 25} Finally, the State presented substantial circumstantial evidence that Leigh was the shooter. Marrico testified that he was not friends with Leigh and had only met

him a couple of times.   Marrico indicated that his communications with Leigh mainly were through Facebook Messenger with Leigh using the profile name "Brando So Humble."

{¶ 26} Marrico described how on February 14, 2018, two days before the shooting, Leigh had shown his 9 mm handgun to Marrico and Tillman, and Tillman had put the gun in his pocket and left with it.   Leigh, believing that Marrico had stolen the gun, then sent Marrico a series of Facebook messages that Marrico interpreted as warnings to return the weapon.   Marrico also received several phone calls from Brando So Humble that he did not answer.   At 12:22 p.m. on February 15, the day before the shooting, Marrico received a message from Leigh, saying "This is the last time I'm telling you this You Gone Give me my sh*t or do you really want to go thru this."   State's Ex. 65 & 66b.   He received another similar message 26 minutes later.   Then, a couple of minutes later, Leigh sent a message saying, "Ight Bet."   After a few additional messages where Leigh asked Marrico where he was, Leigh wrote, "But just to tell this really the last time I'm asking you So * * * You Don't Tell me Nun in like an hour it's over * * *."   At 3:14 p.m., Leigh sent a final message to Marrico saying "Bet."

{¶ 27} Detective Farkas testified about additional Facebook conversations between Leigh ("Brando So Humble") and (1) Tillman ("Lilreef Ah Realviewboy"); (2) Leigh's sister, Brittany Leigh ("Jai Bee"); (3) Gabrielle Marzhaka ("LightBright Gabby"); (4) an unidentified person who used the profile name "Ypn Prince;" (5) an unidentified person who used the profile name "Shamica Mariee;" (6) an unidentified person who used the profile name "Semaj Hall;" (7) Sir Christion Rogers ("Sir Christion Rogers"); and Theodore Shavers ("Nlmb Msrmar").   Detective Farkas created a timeline of the various

communications, reflecting Leigh's statements that Marrico robbed him of a gun, his efforts to get Marrico to return it, and Leigh's efforts to find Marrico. At 12:40 p.m. on February 15, Leigh sent a message to Semaj Hall, saying "I need some bullets, some sh*t happened last night." Less than an hour later, Leigh's sister asked Leigh if he "want[ed] the house sprayed with ks [AK-47s or the like]" and she would buy him a gun later. Leigh later told Ypn Prince that he was robbed by Marrico. At 1:13 p.m. on February 16, Leigh wrote to Shavers to bring him a gun ("pole"). After February 16, Leigh's account did not include references to Marrico or getting his gun back.

{¶ 28} Angela Williams also testified about incriminating statements that Leigh made. Prior to the shooting, Williams heard Leigh say that one of his friends had taken his pistol and he needed to get it back. State's Ex. 99. The next day, Williams heard Leigh talking with his sister about meeting up to get another gun, which he needed to "get his sh*t back." A few days after the shooting, Williams saw information about it on Facebook. Williams testified that Leigh "came up and told [her]" that he was involved. She elaborated: "He walked up to me, he said, Auntie you – did you hear about what happened? I said, what you talking about? He said, the shooting. I said where, in Westwood, that girl that was pregnant? He said, yeah. He said – I said, why you have something to do with that? He said, what you mean I have something to do with it? I did it."

{¶ 29} During the afternoon of February 23, 2018, Lee, Leigh and Bobby Hunter saw a person who looked like a detective drive by Lee's house in a truck. Lee heard Leigh say, "I'm about to go to jail." Later that day, Leigh was arrested for the shooting.

{¶ 30} Construing the evidence in the light most favorable to the State, the jury could have reasonably concluded that Leigh was the shooter. The nature of the shooting indicates that the shooting was not a random event. Leigh's Facebook Messenger communications demonstrated that Leigh believed that Marrico had stolen his gun and would not return it and that Leigh began looking for Marrico to rectify the theft of the weapon. The messages reflect that Leigh concurrently sought to obtain another gun. Lee's testimony placed Leigh in the general area of the shooting when the shooting occurred and, according to Williams, Leigh confessed to the shooting a few days after it occurred. Leigh expressed that he would be going to jail when officers later arrived at Lee's home. The State presented sufficient evidence to support Leigh's convictions.

{¶ 31} In this case, Leigh claimed that he had stopped using his Brando So Humble account prior to February 2018, denied making the incriminating statements to Williams and Lee, and asserted that he was not the shooter. No gun was located, and no one saw the shooter.

{¶ 32} Nevertheless, it was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proved, beyond a reasonable doubt, that Leigh had committed the charged offenses. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. Upon review of the entire record, we cannot conclude that the jury lost its way when it ostensibly credited the State's version of events and found that Leigh shot at Mooty's home, killing Keyona and her unborn child. Leigh's convictions for murder, involuntary manslaughter, and

improper discharge of a firearm at or into a habitation were not against the manifest weight of the evidence.

{¶ 33} Leigh's conviction for having weapons while under disability also was based on sufficient evidence and was not against the manifest weight of the evidence. R.C. 2923.13 provides that, "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: * * * (2) The person * * * has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."

{¶ 34} In this case, the State presented a certified copy of a 2015 delinquency adjudication showing that Leigh was adjudicated delinquent for burglary, contrary to R.C. 2911.12(A)(1), a felony of the second degree. Identifying information in the adjudication entry, including the juvenile's date of birth and the name of his mother, established that the juvenile was Leigh, and the parties stipulated to Leigh's prior adjudication. Joint Ex. 101. Burglary under R.C. 2911.12(A)(1) is a felony offense of violence. *See* R.C. 2901.01(A)(9)(a). Leigh did not possess a weapon when he was arrested in February 2018, and the weapon involved in the shooting was not located. Nevertheless, substantial evidence supported the conclusion that Leigh had possessed a firearm.

{¶ 35} Leigh's fifth assignment of error is overruled.

### III. Admission of Facebook Messages

{¶ 36} In his second assignment of error, Leigh claims that the trial court "erred by allowing testimony that asserted [he] sent Facebook Messenger messages, which

contained hearsay, and that contained evidence of other bad acts." Leigh argues that the State failed to produce any evidence that Leigh, and not someone else, sent the relevant messages from the Brando So Humble Facebook account. He further asserts that the messages should have been excluded because they contained inadmissible hearsay and evidence of prior bad acts.

**{¶ 37}** In general, the admission or exclusion of relevant evidence is within the sound discretion of the trial court, and we review that decision for abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. The term "abuse of discretion" indicates an attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### A. Authentication

**{¶ 38}** First, Leigh argues that the State failed to present evidence that he sent the Facebook messages and, thus, the messages were not properly authenticated.

**{¶ 39}** Authentication is governed by Evid.R. 901. "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12; *State v. Hatfield*, 2d Dist. Montgomery No. 28990, 2022-Ohio-148, ¶ 84. "The threshold standard for authenticating evidence is low, meaning that the party seeking to introduce the disputed evidence need only demonstrate 'a reasonable likelihood that the evidence is authentic.' " (Citations omitted.) *State v. Shropshire*, 2d Dist. Montgomery No. 28659, 2020-Ohio-6853, ¶ 11.

**{¶ 40}** Evid.R. 901(B) provides examples of several ways that the authentication

requirement may be satisfied. The most common method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). *E.g., State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 34 (2d Dist.); *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30. We have noted that, "in most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages." *State v. Irwin*, 2d Dist. Montgomery No. 26224, 2015-Ohio-195, ¶ 21, quoting *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 75 (8th Dist.).

{¶ 41} Here, the State produced ample evidence to authenticate the Facebook messages. Captain Brad Daugherty, who was a member of the homicide taskforce at the time of the shooting, testified that Marrico provided Facebook messages that were on his cell phone. Daugherty took photographs of those messages. State's Exhibit 65. The detective then prepared a search warrant for Facebook records for several accounts, including Brando So Humble, Little Reef, Rico Murray, and Light Bright Gabby. Trial Tr. 237, 434-435.

{¶ 42} The parties stipulated "State's Exhibit number 66, are records are from the Facebook Messenger account under the profile name Brando So Humble. State's Exhibit Number 66 is a fair, accurate, and complete copy, of those records, and they are a business record made and kept in a regular course of business by Facebook, Inc." Trial Tr. 438-439. The email account associated with the "Brando So Humble" Facebook account was brandonleigh* * *@* * *.com.

{¶ 43} Marrico testified that he communicated with Leigh using Facebook Messenger, both by sending messages and making telephone calls. Marrico stated that he used the profile name "Rico Murray" and Leigh used the profile name "Brando So Humble." Marrico identified Leigh as the person shown in three photos from the Brando So Humble Facebook account, State's Exhibits 68-70. Marrico stated that he arranged to meet up with Leigh using Facebook Messager and the person depicted in State's Exhibit 68 was the individual he met. Marrico further stated that State's Exhibit 70 depicted how Brando So Humble/Leigh looked in late 2017 and early 2018. When presented with a printout of Facebook messages between Rico Murray and Brando So Humble (State's Exhibit 65), Marrico testified that they were "[m]essages between me and Brandon" and were "fair, consistent, accurate, and complete" reports of the communications between them on those dates. Trial Tr. 184-185. Reviewing the Facebook communications, Marrico testified that he had called "Brando So Humble" and spoken with Leigh; Leigh had demanded that Marrico return his gun. Trial Tr. 189-191.

{¶ 44} The State's evidence was sufficient to demonstrate not only that the Facebook messages were authentic business records, but that Leigh was the person using the "Brando So Humble" Facebook Messenger account. The trial court did not err when it determined that the State adequately authenticated the Facebook messages.

**B. Hearsay**

{¶ 45} Next, Leigh argues that the Facebook messages were "replete with inadmissible hearsay." Leigh reiterates that the State did not establish that Leigh was using the Brando So Humble account and that statements from other individuals to Leigh

were offered for the truth of the matter asserted.

{¶ 46} Under Evid.R. 801(C), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Statement" is defined as (1) an oral or written assertion or (2) nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A). "An 'assertion' for hearsay purposes 'simply means to say that something is so,' e.g., that an event happened or that a condition existed." (Emphasis and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 97. Assertions can generally be proven true or false. *Id.*; *Rogers v. Olt*, 2018-Ohio-2110, 112 N.E.3d 407, ¶ 14 (2d Dist.). In general, hearsay is not admissible. Evid.R. 802.

{¶ 47} "Certain statements are excluded from the definition of hearsay, including statements of a party-opponent where the statement is offered against that party." Evid.R. 801(D)(2)(a); *State v. Cole*, 2d Dist. Miami No. 2013-CA-18, 2014-Ohio-233, ¶ 36.

{¶ 48} Leigh highlights several statements that he claims were improperly offered for the truth of the matter asserted. He notes an exchange between "Brando So Humble" and "Lilreef":

Lilreef ah Realviewboy: wya rn [where you at right now?]

Brando So Humble: by the bass get bullets

Detective Farkas explained that "the bass" was referring to an apartment complex.

{¶ 49} Leigh argues that Lilreef's statement was used to prove the truth of Leigh's location, but Lilreef's message was a question, not an "assertion," and thus did not constitute a statement under the hearsay rule. *See, e.g., State v. Moody*, 2d Dist.

Montgomery No. 26926, 2016-Ohio-8366, ¶ 92; *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 106.   Significantly, it was Leigh ("Brando So Humble"), not Lilreef, who indicated where Leigh had gone.   Leigh's response constituted an admission of a party-opponent under Evid.R. 801(D)(2) and it was admissible as substantive evidence of his guilt.

{¶ 50} Leigh also points to two Facebook messages between him and his sister. At 2:49 a.m. on February 15, 2018, Leigh wrote to his sister, "I got somebody selling a pole."   Detective Farkas stated that a "pole" is a handgun. Trial Tr. 510-511.   Again, this statement by Leigh was admissible as an admission.   At 1:32 p.m. later that day, Leigh's sister messaged him, "or you just want the house sprayed with k's and I buy you a gun [later]."   Trial Tr. 518.   Leigh responded to this message with a phone call.   Leigh's sister's question was not an assertion, and thus did not constitute hearsay.

### C. Prior Bad Acts

{¶ 51} Finally, Leigh argues that the trial court impermissibly allowed testimony that Leigh planned to smoke marijuana, planned to rob people, and had a gun.   Leigh claims that the evidence should have been precluded under Evid.R. 404(B) and R.C. 2945.59.

{¶ 52} Evid.R. 404(B)(1) states: "Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   In other words, it does not necessarily follow that because a person performed an act in the past, he or she committed this act.

{¶ 53} Evid.R. 404(B)(2) recognizes that other-act evidence may properly be used for other purposes. Such purposes include proof of motive, opportunity, intent, preparation, plan, absence of mistake, identity, knowledge, or lack of accident. *Id.* "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 54} R.C. 2945.59 similarly provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 55} Like Evid.R. 404(B), R.C. 2945.59 "preclude[s] the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes, e.g., to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v.*

*Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 25; *State v. Robinson*, 2d Dist. Montgomery No. 29272, 2022-Ohio-2896, ¶ 22.

**{¶ 56}** In *Williams*, the Ohio Supreme Court set forth a three-step analysis for determining the admissibility of other-acts evidence. *Williams* at ¶ 20. "[T]o be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841 ¶ 72, citing *Williams* at ¶ 20.

**{¶ 57}** " 'The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law.' " *Graham* at ¶ 72, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. "The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose." (Citations omitted.) *Id.*

**{¶ 58}** During his testimony, Marrico described what led to the "falling out" between him and Leigh. Marrico stated that he and Tillman got together with Leigh, and the three were "walking around chilling, planning on smoking and stuff, and like planning on hitting a lick and stuff." Trial Tr. 181. Marrico explained that "hitting a lick" meant robbing someone. While they were together, Leigh said that he had a gun and showed the others a black 9 mm handgun. Marrico stated that Tillman put the gun in his pocket and still had it when the group separated. *Id.*

{¶ 59} Marrico's testimony was not offered to disparage Leigh's character or to show that he was likely to commit criminal acts. Rather, Marrico's testimony explained Leigh's motive for the shooting, namely his belief that Marrico had stolen his gun, and his testimony was relevant to the issue of the identity of the shooter. In addition, the probative value of Marrico's testimony was not substantially outweighed a danger of unfair prejudice. Marrico's reference to planning a robbery was fleeting and a minor detail given the overall course of the trial.

{¶ 60} Leigh also disputes a statement from Detective Farkas that various Facebook Messenger threads between February 13, 2018, and February 18, 2018 related to "a robbery" and locating Marrico. Trial Tr. 494-495. Detective Farkas's review of the Facebook Messages makes clear that he was referring to the theft of Leigh's gun, which Marrico allegedly had taken from Leigh, not any prior robbery that Leigh had committed. In short, Farkas's statement does not refer to a prior bad act.

{¶ 61} Leigh's second assignment of error is overruled.

### IV. Testimony of Angela Williams

{¶ 62} In his first assignment of error, Leigh claims that the trial court "erred by admitting hearsay testimony of Angela Williams" and that the admission of her probable cause hearing testimony violated his rights under the Confrontation Clause. Leigh specifically argues that (1) the trial court erred in finding that she was an unavailable witness and (2) he did not have meaningful prior opportunity for cross-examination. He further asserts that the audio recording of Williams's testimony at the probable cause hearing was not authenticated.

{¶ 63} On January 14, 2020, the State issued a subpoena for Williams to appear at 8:00 a.m. on Monday, March 9, 2020, for Leigh's rescheduled trial. The record reflects that Detective Farkas personally served the subpoena on January 21, 2020. Williams did not appear for the March 9, 2020 trial as required, and at 8:45 a.m., the State asked the court to issue a material witness warrant for Williams. The State's motion indicated that Williams had failed to meet with prosecutors for a pretrial conference and failed to appear pursuant to the subpoena. The trial court granted the State's motion.

{¶ 64} The following day, March 10, the State moved the trial court for an order declaring Williams an unavailable witness, pursuant to Evid.R. 804(A)(5), and asked that her former testimony be admitted at trial. That afternoon, the trial court held a brief hearing (outside the presence of the jury) on the State's motion. The court noted that this issue had previously been raised in October 2019 prior to Leigh's previous trial date, and it stated that the motion and memorandum in opposition would be "incorporated by reference into the decision making process now." Detective Farkas then testified about his efforts to locate Williams.

{¶ 65} Defense counsel did not cross-examine Detective Farkas, but he argued that the State's request should be denied because the probable cause hearing did not provide a full and fair hearing. Counsel stated that additional information, such as Williams's prior convictions, was not available to Leigh's juvenile court counsel for use in cross-examination.

{¶ 66} The trial court overruled defense counsel's objection and granted the State's motion. The trial court reasoned that, under *Crawford*, there needs to be an

opportunity for cross-examination, but cross-examination does not have to occur. The trial court noted that cross-examination did occur at the probable cause hearing "by the very attorney representing your client for the very incident that we are here." The trial court declared Williams unavailable and allowed her probable cause hearing testimony to be presented. The State played Williams's probable cause hearing testimony for the jury later that afternoon.

**A. Authentication**

{¶ 67} We begin with Leigh's argument that the State failed to properly authenticate the audio recording of Williams's probable cause hearing testimony.

{¶ 68} Immediately prior to playing Williams's former testimony, the prosecution asked for a sidebar and asked the court how it wanted the State to introduce the former testimony. After a brief discussion, the court indicated that it would inform the jury that the witness was unavailable and her former testimony would be played. When asked if he had any comments, defense counsel responded, "You're the judge."

{¶ 69} At the conclusion of the sidebar, the court then addressed the jury:

THE COURT: All right, ladies and gentlemen, sometimes in trials a witness is or becomes unavailable for testimony for whatever reasons, and if that witness has given prior testimony, and that prior testimony is recorded, the rules allow for that prior testimony to be presented now. It's my understanding that the State wishes to introduce the prior testimony of Angela Williams; is that correct?

[PROSECUTOR]: That's correct, Judge.

THE COURT: And the method by which that will be presented will be by an audio tape; is that correct?

[PROSECUTOR]: That's correct, Judge.

THE COURT:   All right. Now, my understanding is, I've listened to the audio tape.   And my understanding is at one point during the course of the audio tape, there's a little bit of a commotion.   You're not going to have video, but it's apparent there's some commotion going on in the courtroom.   You're not to pay any attention to that; there's nothing about that that is pertinent to either side of any issue here today.

There are also some objections made during the course of it, I think a telephone goes off or something.   The objections were ruled on by the judge at the hearing.   Those objections and rulings will stand.

Otherwise, Mr. [Prosecutor], I'd ask that you play the tape, not at the very beginning, but at whatever time you've designated for the testimony to start, which would be the entire testimony?

[PROSECUTOR]: Yes, Your Honor.

THE COURT: Okay, you can proceed.

[PROSECUTOR]: And I would note for the record that this audio CD is marked as State's Exhibit 99.

THE COURT: Thank you. So pay attention to this, folks, just as if the witness is testifying.

Defense counsel did not object to the trial court's introduction of the audio recording.

{¶ 70} Although Leigh previously had objected to the admission of Williams's probable cause hearing testimony due to an alleged lack of opportunity to fully cross-examine Williams, he did not object based on the State's failure to authenticate the recording. Accordingly, Leigh has waived all but plain error with respect to the authentication of the audio recording of her probable cause hearing testimony. Plain error arises only when, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 71} In this case, the recording itself (State's Exhibit 99) leaves little doubt that it reflects Williams's probable cause hearing testimony. Although the trial court ordered that the juvenile court judge's preliminary statements not be played for the jury, the recording begins with the judge identifying himself, calling the case, indicating what proceedings were occurring, and identifying who was present in that courtroom. There is nothing to suggest that the recording is not what it purports to be. In the absence of an objection, we find no plain error in the trial court's admission of Williams's probable cause hearing testimony.

### B. Confrontation Clause and Hearsay

{¶ 72} Leigh primarily argues that Williams's probable cause hearing testimony constituted hearsay and that its admission violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

{¶ 73} Under the Confrontation Clause, a criminal defendant enjoys the right "to be confronted with the witnesses against him." Under this provision, testimonial out-of-court statements are barred, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 17; *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Under the Ohio Rules of Evidence, former testimony given as a witness at another hearing is not excluded by the hearsay rule if (1) the witness is unavailable and (2) "the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Evid.R. 804(B)(1). "Testimony given at a preliminary hearing must satisfy the right to confrontation and exhibit indicia of reliability." *Id.*

{¶ 74} We review the trial court's ruling on the admissibility of Williams's prior probable cause hearing testimony for an abuse of discretion. *State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 51.

**1. Testimonial**

{¶ 75} At the outset, we find little difficulty concluding that Williams's probable cause hearing testimony was testimonial for purposes of the Confrontation Clause. In *Crawford*, the United State Supreme Court interpreted "testimony" to typically mean "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51, quoting 2 N. Webster, An American Dictionary of the English Language (1828). "[T]he core class of testimonial statements includes statements 'that were made under circumstances which would lead an objective witness

reasonably to believe that the statement would be available for use at a later trial.' " *State v. Syx*, 190 Ohio App.3d 845, 2010-Ohio-5880, 944 N.E.2d 722, ¶ 23 (2d Dist.), quoting *Crawford* at 52. The *Crawford* Court cited ex parte testimony at a preliminary hearing as an example of "this core class of 'testimonial' statements." *Id.* at 52. Williams's sworn testimony at the juvenile court's probable cause hearing unequivocally constitutes testimonial statements.

### 2. Unavailable Witness

{¶ 76} Both the Confrontation Clause and Evid.R. 804 permit the admission of prior testimony only if the witness is unavailable. Evid.R. 804(A) identifies five circumstances when a declarant is unavailable, including when the witness "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5).

{¶ 77} In criminal cases, the State bears the burden of establishing that the declarant is unavailable to testify to use hearsay made at the prior judicial proceeding. *State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 50, citing *State v. Smith*, 2d Dist. Montgomery No. 22926, 2010-Ohio-745, ¶ 10. Both the Confrontation Clause and Evid.R. 804(B)(1) normally require a showing by the State that the hearsay declarant is unavailable despite reasonable efforts made in good faith to secure his or her presence for trial. *Smith* at ¶ 11, citing *State v. Keairns*, 9 Ohio St.3d 228, 460 N.E.2d 245 (1984). "[T]he test is whether the State made reasonable, good-faith efforts to secure their appearance, not whether it took every conceivable step." *Mitchell* at ¶ 14.

{¶ 78} "A showing of unavailability must be based on testimony of witnesses rather

than hearsay; mere statements that a search has been made lack sufficient particularity to allow the court to determine what steps have been taken and whether they were reasonable." *Jackson* at ¶ 50.

**{¶ 79}** Defense counsel did not object to Williams's former testimony on the ground that her unavailability had not been established. Consequently, Leigh has waived all but plain error as to the trial court's ruling on Williams's unavailability. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 176; *State v. Mitchell*, 2d Dist. Montgomery No. 24797, 2012-Ohio-3722, ¶ 10 (failure to dispute unavailability constitutes waiver of all but plain error on that issue).

**{¶ 80}** During his testimony about his efforts to locate Williams, Detective Farkas stated that he was the lead detective on the case and was aware that the court had issued a material witness warrant for Williams on March 9. Within hours of the issuance of the warrant, an email (called a suspect locator) was sent to all Dayton police officers, advising them that Williams had a warrant for her arrest and to attempt to locate her. The email directed any officer who encountered Williams to call Farkas directly on his cell phone. No officer contacted the detective in response to the suspect locator email.

**{¶ 81}** Detective Farkas tried to contact Williams several times at the phone number that she had provided to him when she was initially served in January 2020, which was also the phone number provided to Detective Farkas by the probation department. The first two phone calls went directly to Williams's voicemail and then her phone indicated that the mailbox was full. Farkas did not have any other phone number for Williams.

{¶ 82} The detective also went to four different locations in an attempt to locate Williams: (1) an address on Kenwood Avenue where Williams was served in November 2019 for a previous trial date; (2) an address on Westwood Avenue, which was the address Williams provided to her probation officer and the probation department provided to Farkas; (3) an address on Sylvan Avenue, where Williams's mother lived; and (4) an address on Ellis, an address given to the police in October 2019 during a separate incident. No one was home at the Kenwood and Sylvan Avenue addresses. At the Westwood address, Detective Farkas spoke to a person who claimed to be a cousin of Williams; the cousin said that Williams did not live there, but she would attempt to get in contact with Williams and have Williams call him. Detective Farkas left his cell phone number with the cousin, but neither the cousin nor Williams had made contact. Finally, when Detective Farkas went to the Ellis address, he spoke to a former girlfriend of Williams, who said that she had not seen Williams since she was arrested for domestic violence. The former girlfriend was unable to provide updated contact information, and the police did not have addresses for any other potential relatives.

{¶ 83} Detective Farkas contacted three local hospitals to inquire whether Williams had been admitted. The hospitals all reported that they did not have a patient named Angela Williams at their locations. Farkas also checked whether Williams was incarcerated in Montgomery, Miami, Clark, Green, Darke, or Warren County; she was not in custody in any of those locations as of 11:45 a.m. that day.

{¶ 84} In this case, the trial court did not commit error, plain or otherwise, when it determined that Williams was unavailable. Williams failed to appear for trial as required

by a subpoena that she received in January 2020, and a material witness warrant had been issued to compel her appearance. Detective Farkas's testimony established that Dayton police officers had been notified to look for her but were unsuccessful, that Williams was not responding to repeated phone calls from Detective Farkas, that he was unable to locate her at her stated address and other related residences, and that he had determined that she was neither incarcerated in Montgomery County and the surrounding counties nor hospitalized nearby. The trial court did not abuse its discretion in determining that the detective's efforts to secure Williams's presence were reasonable.

### 3. Prior Opportunity to Cross-Examine

{¶ 85} Leigh further claims that the probable cause hearing testimony was inadmissible because his attorney did not have a meaningful opportunity or a similar motive to develop Williams's testimony at the probable cause hearing as he did at trial. At trial, defense counsel argued that Leigh's counsel in the juvenile court did not have information that would be important for cross-examination at trial, such as Williams's prior convictions.

{¶ 86} The Confrontation Clause was written "to secure for the opponent the opportunity of cross-examination." (Emphasis omitted.) *State v. Self,* 56 Ohio St.3d 73, 76, 564 N.E.2d 446 (1990), quoting 5 Wigmore, Evidence, Section 1395, at 150 (Chadbourn Rev. 1974); *State v. Curtiss*, 2d Dist. Montgomery No. 29006, 2022-Ohio-146, ¶ 71. Thus, the Confrontation Clause permits the admission of an unavailable witness's prior testimony if the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. 36, 54, 57-59, 124 S.Ct. 1354, 158 L.Ed.2d 177; *State v.*

*Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 181. Leigh's attorney in juvenile court was afforded the right to cross-examine Williams at the probable cause hearing, and he exercised that right. Accordingly, no Confrontation Clause violation occurred when Williams's prior testimony was presented at trial.

**{¶ 87}** The Ohio Rules of Evidence require an additional layer of analysis. Because testimony may be admissible under the Confrontation Clause yet inadmissible under the rules of evidence, and vice versa*, see Crawford* at 51, the declarant's statements must fall within the constitutional requirements and the rules of evidence to be admissible. *State v. Wilson*, 2d Dist. Clark No. 2018-CA-2, 2020-Ohio-2962, ¶ 69, citing *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, 869 N.E.2d 719, ¶ 36 (2d Dist.).

**{¶ 88}** The requirements of Evid.R. 804(B)(1) are two-fold: (1) the party against whom the testimony is offered had an opportunity to examine the declarant in the prior proceeding, and (2) that party had a motive that is similar to the motive that the party would have in the present proceeding to develop the former testimony by direct, cross, or redirect examination. *Burkhart v. H.J. Heinz Co.*, 140 Ohio St.3d 429, 2014-Ohio-3766, 19 N.E.3d 877, ¶ 3; *Cranford v. Buehrer*, 2d Dist. Montgomery No. 26266, 2015-Ohio-192, ¶ 25.

**{¶ 89}** "An identical motive to develop testimony is not required by Evid.R. 804(B)(1), only a similar motive." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 26; *Neyland* at ¶ 182. The similar-motive requirement "has become, not a mechanical one of identity or even of substantial identity of issues, but rather that the

issues in the first proceeding, and hence the purpose for which the testimony was offered, must have been such as to produce an adequate motive for testing on cross-examination the credibility of the testimony." *Neyland* at ¶ 186, quoting McCormick, *Evidence*, Section 304, at 495 (7th Ed.2013).

{¶ 90} During the probable cause hearing, Williams testified primarily about incriminating statements she heard Leigh make to others and his confession to her following the shooting that he had done it. Defense counsel extensively cross-examined Williams at the juvenile court hearing on all aspects of her testimony. Counsel asked her numerous questions about the nature of her relationships with Lee and Leigh, her lack of memory about the dates when certain events occurred, and the details about the events she witnessed and the statements she heard.

{¶ 91} Leigh argues that his attorney's motive at the probable cause hearing was limited to preventing the establishment of "sufficient credible evidence" that he committed the offense, not preventing proof beyond a reasonable doubt. He also asserts that "a mountain of evidence has been developed" since the probable cause hearing. We do not find those arguments persuasive. At both the probable cause hearing and at trial, the identity of the shooter was the primary issue and, in both instances, defense counsel was motivated to discredit Williams's testimony implicating Leigh as the shooter. The trial court did not abuse its discretion in determining that defense counsel had a prior opportunity and a similar motivation to cross-examine Williams under Evid.R. 804(B)(1).

{¶ 92} Leigh's first assignment of error is overruled.

### V. Ineffective Assistance of Counsel

**{¶ 93}** In his third assignment of error, Leigh claims that his defense counsel rendered ineffective assistance in three respects. First, Leigh argues that his attorney should have objected to the authentication of the audio recording of Williams's probable cause hearing testimony. Second, he asserts that he should have objected to the sitting of a prejudicial juror. Third, he claims that counsel should have objected to the other-acts evidence in the Facebook messages.

**{¶ 94}** To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) trial counsel's conduct was deficient, and (2) trial court's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Lloyd*, Ohio Slip Opinion No. 2022-Ohio-4259, __ N.E.3d __, ¶ 15.

**{¶ 95}** Trial counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland* at 687; *Lloyd* at ¶ 16. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687; *State v. Dennis*, 2d Dist. Montgomery No. 29266, 2022-Ohio-2888, ¶ 37. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

**{¶ 96}** The second prong requires a showing that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *Strickland* at 694; *Lloyd* at ¶ 18. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**{¶ 97}** Although Leigh cites three bases for his ineffective assistance of counsel claim, he focuses on his attorney's failure to object to Juror #15 during voir dire. During jury selection, the prosecutor asked prospective jurors "whether anyone had been a victim of a crime * * * in the past that might affect them in their ability to sit as a juror and hear the evidence in this case and be fair." Voir Dire Tr. 98. Juror #15 responded, "I am the victim of a drive-by shooting. * * * And I – there were several rounds shot into the bedrooms of my two small children. But I, that will not affect my ability to judge impartially." The two continued:

[PROSECUTOR]: Let me ask you this; how long ago was that?

[JUROR #15]: About a year ago.

[PROSECUTOR]: Okay. Is that case being prosecuted, if you know?

[JUROR #15]: No, sir.

[PROSECUTOR]: Okay. Now, I've talked about the fact that one of the

charges in this case is firing or the improper discharge of a firearm into a

habitation. And it sounds like that case, and I don't know the facts of the

case that you're talking about, but it sounds like it may be a similar, I don't

know, factual situation where a firearm was involved at least. Knowing

that, and knowing that you may hear evidence that's similar in nature, at

least to some degree, will you be able to set aside the case that you're talking about, albeit, a year ago, and judge this case only on the evidence in court?

[JUROR #15]: Yes, sir.

[PROSECUTOR]: In other words, what we want to find out, kind of on the flip side of things is, because you had that terrible event happen that you're not going to say, you know what, I'm going to make sure that someone pays, okay, I don't care what the evidence is, all right. And that you'll actually sit and listen and judge the case on the evidence. That you're not going to be predisposed, for instance, to find someone guilty because of a situation in your past. It sounds like you don't have problem with that though?

[JUROR #15]: That's correct.

[PROSECUTOR]: Okay. You'll be able to be fair and impartial?

[JUROR #15]: Yes, sir.

[PROSECUTOR]: Okay. I appreciate your candor. * * *

Voir Dire Tr. 99-100.

{¶ 98} Defense counsel also asked Juror #15 about the drive-by shooting. The juror told defense counsel that the incident took place at his house in Denver and the perpetrators had never been apprehended, to his knowledge. *Id.* at 129.

{¶ 99} On appeal, Leigh claims that his trial court should have sought to have Juror #15 removed based on the similarity between the facts in this case and the prospective juror's drive-by shooting incident. A prospective juror may be challenged for cause if the

juror demonstrates a "predisposition to decide a case or an issue in a certain way, which does not leave the mind perfectly open to conviction." *State v. Carruth*, 2d Dist. Montgomery No.1997, 2004-Ohio-2317; *State v. Davis*, 2d Dist. Montgomery No. 20135, 2005-Ohio-121, ¶ 21.

**{¶ 100}** In this case, Juror #15 made clear that he would be able to be fair and impartial, despite the similar nature of the incidents, and that he could judge the case solely on the evidence provided in court. Juror #15 gave no indication that he would be predisposed to find Leigh guilty based on the drive-by shooting of his house in Denver. Given Juror #15's answers during voir dire, defense counsel could have reasonably concluded that he had no basis to seek Juror #15's removal for cause.

**{¶ 101}** We likewise cannot conclude that defense counsel acted deficiently in failing to exercise a peremptory challenge to remove Juror #15. Juror #15 was not initially among the 12 prospective jurors who would be seated as the jury, and he joined that group only after the State and defense counsel each exercised a peremptory challenge. Defense counsel subsequently exercised his three remaining peremptory challenges on other prospective jurors. While one might question why defense counsel elected to use peremptory challenges on other individuals rather than Juror #15, defense counsel's decision was within the realm of trial strategy, which we will not second-guess. Moreover, on this record, we cannot conclude that there was a reasonable probability that the outcome of the trial would have been different had defense counsel made different decisions during jury selection.

**{¶ 102}** With respect to defense counsel's failure to object to the lack of

authentication of the probable cause hearing audio-recording and the admission of Facebook messages with other act evidence, we likewise conclude that Leigh's claims lack merit. Although the State did not offer any evidence to authenticate the audio-recording of Williams's probable cause hearing testimony, there is no indication that the recording was not authentic, and defense counsel, in his professional judgment, could have opted not to raise the issue. Moreover, even if defense counsel had objected to the lack of authentication before the recording was played at trial, the recording would not necessarily have been excluded from evidence. Rather, the State would have had an opportunity to authenticate the exhibit prior to playing it for the jury.

**{¶ 103}** Finally, defense counsel did not render ineffective assistance regarding the Facebook messages. As stated above, the trial court did not err in admitting the Facebook messages into evidence. Accordingly, counsel did not act deficiently in failing to object to those messages under Evid.R. 404(B) and R.C. 2945.59.

**{¶ 104}** Leigh's third assignment of error is overruled.

## VI. Cumulative Error

**{¶ 105}** In his fourth assignment of error, Leigh claims that multiple errors deprived him of a fair trial.

**{¶ 106}** Under the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial[,] even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987).

"However, in order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed." *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000); *State v. Mize*, 2022-Ohio-3163, 195 N.E.3d 574, ¶ 76 (2d Dist.). "We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *Mize* at ¶ 76, quoting *State v. Durant*, 159 Ohio App.3d 208, 2004-Ohio-6224, 823 N.E.2d 506, ¶ 38 (2d Dist.).

**{¶ 107}** Most of the alleged errors that Leigh identifies in support of his cumulative error argument are the same alleged errors previously raised and rejected here. Leigh now cites a few additional statements by Marrico and Detective Farkas, but we do not find any errors, individually or cumulatively, that deprived Leigh of a fair trial.

**{¶ 108}** Leigh's fourth assignment of error is overruled.

## VII. Conclusion

**{¶ 109}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.