[Cite as *State v. Entingh*, 2023-Ohio-2799.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-53 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-0433 |
| | : | |
| JACOB E. ENTINGH | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 11, 2023

. . . . . . . . . . .

MEGAN A. HAMMOND, Attorney for Appellee

JOHN A. FISCHER, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, Jacob E. Entingh, appeals from his convictions for aggravated vehicular homicide and aggravated vehicular assault following a jury trial in the Greene County Court of Common Pleas. In support of his appeal, Entingh claims that the trial court erred by admitting Snapchat videos into evidence at trial that were not properly authenticated. Entingh also claims that his convictions were not supported by sufficient

evidence and were against the manifest weight of the evidence. For the reasons outlined below, we disagree with all of Entingh's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On August 27, 2021, a Greene County grand jury returned a seven-count indictment charging Entingh with the following offenses:

1. **Aggravated vehicular homicide**
   R.C. 2903.06(A)(1)(a) (second-degree felony);

2. **Aggravated vehicular homicide**
   R.C. 2903.06(A)(2)(a) (third-degree felony);

3. **Aggravated vehicular assault**
   R.C. 2903.08(A)(1)(a) (third-degree felony);

4. **Vehicular assault**
   R.C. 2903.08(A)(2)(b) (fourth-degree felony);

5. **Aggravated vehicular assault**
   R.C. 2903.08(A)(1)(a) (third-degree felony);

6. **Vehicular assault**
   R.C. 2903.08(A)(2)(b) (fourth-degree felony); and

7. **Operating a vehicle under the influence of alcohol and/or drugs ("OVI")**
   R.C. 4511.19(A)(1)(a) (first-degree misdemeanor).

{¶ 3} The charges stemmed from a single-vehicle collision that occurred on the night of April 19, 2020, in Sugarcreek Township, Greene County, Ohio. The collision resulted in the death of 25-year-old Austin Gibbs and serious physical harm to then 17-year-old Hayley Glandon and 19-year-old Kaitlyn Reynolds. It was alleged that 19-year-

old Entingh had been the driver of the vehicle and that he had been under the influence of alcohol and drugs at the time of the collision. Entingh was allegedly driving north on Wilmington Dayton Road at a high rate of speed when he drove through stop signs posted at a three-way T-intersection with Conference Road; Entingh attempted to turn left at the intersection, but he was traveling too fast, went through the guardrail, and hit several trees before coming to rest in a ditch off the side of the road.

{¶ 4} On September 3, 2021, Entingh appeared at his arraignment hearing and pled not guilty to the indicted charges. Thereafter, Entingh's case proceeded to a five-day jury trial during which the State presented several witnesses and exhibits. The State's witnesses included victims Glandon and Reynolds; Glandon and Reynolds's former roommate, Alexis Vander Yacht; and Gibbs's former girlfriend, Chelsea Damico. The State also presented Craig Moore, an individual who lived near the crash scene and called 9-1-1 for help. The State's witnesses also included the responding and investigating law enforcement officers and two collision reconstructionists. In addition, the State presented the custodian of the audio-recorded 9-1-1 call, the paramedic who assessed Entingh after the collision, the emergency room physician who treated Entingh at the hospital, and the coroner who examined Gibbs's body. In his defense, Entingh presented testimony from his mother and from Dr. Lance Platt, an OVI investigation expert. The following is a summary of the testimony and evidence that was presented at Entingh's trial.

{¶ 5} At the time of the collision, the victims, Glandon, Reynolds, and Gibbs, lived together in a Kettering apartment with Alexis Vander Yacht and Sidney Bender. On the

afternoon of April 19, 2020, the five roommates were together at their apartment with Entingh, who had been invited over by Glandon. Vander Yacht testified that all of the roommates and Entingh had been smoking marijuana at the apartment that afternoon; in addition, Entingh and Gibbs had been drinking beer and Entingh had ingested acid at approximately 2 p.m.

{¶ 6} Later that evening, Vander Yacht and Bender left the apartment to celebrate Vander Yacht's birthday with another group of friends. Vander Yacht testified that Entingh, Glandon, Reynolds, and Gibbs left the apartment 10 to 15 minutes before her to go driving; Vander Yacht had made Glandon promise that Glandon would not let anyone else drive, because she believed that Glandon was the only sober person in the group. Later that night, Vander Yacht learned that Entingh, Glandon, Reynolds, and Gibbs had been in a car crash, and she went back to their apartment to get some clothes to bring to Glandon and Reynolds at the hospital. When Vander Yacht returned to the apartment, she noticed that there were more empty beer cans lying around, which led her to believe that the others had consumed more alcohol that night.

{¶ 7} Craig Moore, who lived near the T-intersection at Wilmington Dayton and Conference Roads, was watching television at his residence on the night of April 19, 2020, when he heard a loud crash. When Moore went outside to investigate the noise, he saw a man, later identified as Entingh, standing in the middle of the road yelling for help. Moore ran over to the intersection and saw that a vehicle had driven through the guardrail and ended up in a deep ditch off the road. Moore immediately called 9-1-1 for help. The State presented an audio recording of Moore's 9-1-1 call and the associated call detail

report. *See* State's Exhibits 1.1. and 1.2. The call detail report established that Moore had placed the call at 11:23 p.m.

{¶ 8} Officer Nathan McKeever of the Sugarcreek Township Police Department testified that he was the first police officer to arrive at the scene of the collision. When he arrived, McKeever observed that a black Lexus had gone through the guardrail and ended up in a ditch. When McKeever approached the vehicle, he observed a female in the front-passenger seat, who was screaming. McKeever also observed an unconscious female in the back of the vehicle behind the driver's seat and a male passenger next to her who appeared to be deceased.

{¶ 9} After assessing the scene and telling the screaming female that help was on the way, Ofc. McKeever made contact with Entingh, who was standing across the street. McKeever's interactions with Entingh were video recorded by the officer's body camera. The body camera recording, which was admitted into evidence at trial, showed that Entingh was covered with blood. *See* State's Exhibit 2. However, Entingh advised McKeever that he was not injured. Although Entingh was able to stand and move without assistance, he appeared disoriented and confused in the video. Entingh was able to provide McKeever with his name and address but had difficulty answering questions about how many people were in the vehicle and how he had been able to exit the vehicle. Entingh also appeared to be confused about what vehicle had been in the collision and whether he had been driving. However, after aggressive questioning by McKeever, Entingh admitted to being the driver. When McKeever asked Entingh how much alcohol he had consumed, Entingh claimed that he had had none.

{¶ 10} Trooper John Garner of the Ohio State Highway Patrol testified that he responded to the crash scene at 12:11 a.m. and initially spoke with Entingh in the back of Ofc. McKeever's police cruiser. During that time, Garner noticed that Entingh's eyes were red and bloodshot and that his pupils were dilated. Garner also detected a moderate odor of an alcoholic beverage in the police cruiser where Entingh was sitting. After Entingh was taken to the hospital and released, Garner spoke with Entingh again at 3:01 a.m. in the back of his police cruiser. That conversation was video recorded by Garner's cruiser camera and admitted into evidence at trial. The video recording showed Entingh admitting to smoking marijuana a few hours before the crash and to consuming two or three cans of beer an hour before driving. *See* State's Exhibit 5.1.

{¶ 11} Madeline Dixon, a paramedic, testified that she had arrived at the crash scene at 11:31 p.m. and assessed Entingh while Entingh was standing on the side of the road with Ofc. McKeever. Dixon testified that Entingh was conscious and able to answer questions at that time. When Dixon asked Entingh if he had consumed any drugs or alcohol, Entingh responded: "Most likely." State's Exhibit 2; Trial Tr. Vol. I, p. 89. Once Dixon confirmed that Entingh was in a stable condition, she went to help one of the injured females. Thereafter, Dixon returned to Entingh and rode with him to the hospital in an ambulance.

{¶ 12} In the ambulance, Dixon did a head-to-toe assessment of Entingh at 12:43 a.m. During the assessment, Dixon observed a small laceration to Entingh's forehead. Dixon also observed that Entingh's pupils were dilated, which Dixon explained could be indicative of either a head injury or drug and alcohol use. Dixon testified that Entingh

was alert and oriented and that she did not detect the odor of an alcoholic beverage or marijuana on Entingh. However, Dixon testified that Entingh had told her that he consumed two beers and took two tabs of acid prior to driving.

{¶ 13} Andrea King, the emergency room physician who examined Entingh, testified that Entingh arrived at the hospital at 12:57 a.m. King testified that when she examined Entingh, his pupils were normal and he was oriented and not confused; Entingh had lacerations on his forehead and right eyelid and a broken nose. King also testified that Entingh's CAT scans revealed no head injury. However, based on Entingh's facial lacerations and broken nose, King testified that Entingh obviously had hit his head on something and that hitting one's head can cause disorientation. Both King and paramedic Dixon testified that a head injury usually results in a patient's condition rapidly deteriorating as opposed to improving and that Entingh's condition had not suggested that he was suffering from a head injury.

{¶ 14} As for Glandon and Reynolds, paramedic Dixon testified that they were both transported by helicopter from the crash scene to the hospital for treatment. Glandon testified that she had broken her neck, back, and ribs in the collision. Reynolds, who is now confined to a wheelchair, testified that as a result of the collision she suffered from a traumatic brain injury, bleeding in her brain, a broken back, a spinal cord injury, broken ribs, collapsed lungs, a shattered right kidney, a damaged colon, a broken arm, a broken leg, and a broken scapula. Reynolds additionally testified that her legs will never work again and that she had undergone a lot of physical and occupational therapy.

{¶ 15} Reynolds testified that she had no independent memory of what had

happened on the day of the collision; she only remembered waking up in the hospital and being told that her legs would never work again. Glandon testified that she had gaps in her memory and that she was only able to recall what had happened based on viewing a series of Snapchat videos that Gibbs had posted just prior to the collision. The Snapchat videos were screen-recorded the day after the collision by Gibbs's former girlfriend, Chelsea Damico. Damico testified that she had screen-recorded the Snapchat videos using her iPhone and then provided the screen-recorded videos to the police. The videos were admitted into evidence at trial over Entingh's objection, as Entingh claimed that the videos had not been properly authenticated.

{¶ 16} The Snapchat videos initially showed a female in the driver's seat of the vehicle and a male in the front-passenger's seat. *See* State's Exhibit 7. Glandon identified herself as the female driver and Entingh as the front-seat passenger. In the video, a female voice, presumably Reynolds, can be heard giving Glandon instructions on how to drive and another voice yelling for Glandon to "floor it." *Id.* Glandon testified that Entingh took over driving after the others complained that she was not driving fast enough. Although dark and difficult to see, the later Snapchat videos showed a different driver who was driving much more dangerously. In the later videos, the driver was driving at a high rate of speed, consistently crossing over the road's double-yellow-center line, and driving into the wrong side of the road while negotiating sharp curves. On the very last video, the driver was accelerating quickly and traveling so fast over a hill that the vehicle appeared to go airborne.

{¶ 17} Trooper Rachel Simmons of the Ohio State Highway Patrol testified that

she had been assigned to investigate the Snapchat videos. In doing so, Simmons paused the videos and took screenshots of video stills that she believed had investigative value. For example, Simmons took screenshots of the vehicle's speedometer showing a three-digit number, which indicated that Entingh was driving in excess of 100 miles per hour. *See* State's Exhibit 11.4G. Simmons also took a screenshot showing a wristwatch on Entingh's right arm while he was in the front-passenger seat and a later screenshot showing the driver of the vehicle wearing a wristwatch on the same right arm.[1] *See* State's Exhibits 11.4C and 11.4H. One screenshot also appeared to show Entingh's reflection in the vehicle's rearview mirror, and another appeared to show the time as 11:17 p.m., just five minutes before the 9-1-1 call. *See* State's Exhibit 11.4F and 11.4H.

{¶ 18} One of the State's collision reconstructionists, Gregory Russell, testified that, based on his calculations, the vehicle was traveling 98 miles per hour *or greater* just 4.8 sections before it impacted the guardrail at the intersection of Wilmington Dayton and Conference Roads. Multiple witnesses testified that the posted speed limit in that area is 55 miles per hour. In his expert report, Russell concluded that the cause of the collision was a combination of Entingh's traveling at an excessive speed and his failure to react to the impending threat of the intersection despite having ample warning. *See* State's Ex. 9.1. The photographic evidence presented at trial established that there were two reflective stop-ahead signs posted ahead of the intersection, two reflective stop signs on each side of the roadway at the intersection, and a reflective directional sign in the

---

[1] The wristwatch is difficult to see in the screenshot image marked as State's Exhibit 11.4H, as the wristwatch simply looks like a band of light. However, comparing the screenshot image to the live video, the wristwatch can be discerned on the driver's right arm.

middle of the intersection.    *See* State's Exhibits 1.4A; 1.4B; 1.4C; 10.2H; 10.2I; 10.2J.

**{¶ 19}** After the State rested its case, Entingh's mother testified for the defense that Entingh had come home around 9:15 or 9:20 p.m. on the night of the collision, had not smelled of alcohol, and had been behaving normally.   Entingh's mother testified, however, that she went to bed at 9:30 p.m. and had not known that Entingh left the house later that night.

**{¶ 20}** Dr. Lance Platt, an OVI investigation expert, also testified for the defense. In doing so, Dr. Platt provided his expert opinions based on the video footage of Entingh's interactions with Ofc. McKeever and Tpr. Garner.   In his expert report, Platt opined that Entingh's "speech and recall could be affected by the crash, optics of the crash and injuries including facial lacerations and a broken nose."   State's Exhibit C.   Platt also opined that "it would be difficult to say that Mr. Entingh was under the influence of a Hallucinogenic or any drug or controlled substance at the time of driving."   *Id.*

**{¶ 21}** At the end of trial, the jury found Entingh guilty of all seven indicted charges. At sentencing, the trial court merged the two counts of aggravated vehicular homicide that pertained to Gibbs's death.   Following the merger, the State elected to have Entingh sentenced for the second-degree-felony count that was charged under R.C. 2903.06(A)(1)(a).

**{¶ 22}** The trial court also merged the aggravated vehicular assault and vehicular assault counts that pertained to Glandon; the State elected to have Entingh sentenced for aggravated vehicular assault.   The same merger and election were carried out for the counts of aggravated vehicular assault and vehicular assault that pertained to Reynolds.

The trial court then merged the single OVI count into all the other offenses. Therefore, Entingh was convicted of one count of aggravated vehicular homicide and two counts of aggravated vehicular assault.

{¶ 23} The trial court imposed an indefinite, mandatory term of a minimum of 8 years to a maximum of 12 years in prison for the aggravated vehicular homicide and 60 months in prison for each of the aggravated vehicular assaults. The trial court ordered those sentences to be served concurrently; therefore, Entingh was sentenced to a total mandatory indefinite term of a minimum of 8 years to a maximum of 12 years in prison. The trial court also ordered Entingh to pay $13,809.11 in restitution to the victims and suspended Entingh's driver's license for life.

{¶ 24} Entingh appeals from his conviction, raising three assignments of error.

**First Assignment of Error**

{¶ 25} In his first assignment of error, Entingh contends that the trial court erred by admitting the screen-recorded Snapchat videos into evidence at trial on grounds that the videos were not properly authenticated. We disagree.

{¶ 26} "A trial court has broad discretion regarding the admission of evidence, and a ' "reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion." ' " *State v. Bond*, 2d Dist. Montgomery No. 29516, 2023-Ohio-1226, ¶ 15, quoting *State v. Montgomery*, 2d Dist. Montgomery No. 28404, 2020-Ohio-513, ¶ 16, quoting *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. "A trial court abuses its discretion when it makes a decision that is unreasonable,

unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "The issue then is whether the trial court's admission of the contested evidence was unreasonable, arbitrary, or unconscionable." *Bond* at ¶ 15, citing *Montgomery* at ¶ 16 and *Noling* at ¶ 43.

{¶ 27} "Ohio courts have addressed the issue as to the admissibility of evidence from social media content * * * under the authentication requirements of Evid.R. 901." (Citations omitted.) *State v. McCarrel*, 10th Dist. Franklin No. 18AP-660, 2019-Ohio-2984, ¶ 39. " 'Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be.' " *State v. Leigh*, 2023-Ohio-91, 206 N.E.3d 37, ¶ 39 (2d Dist.), quoting *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12. (Other citation omitted.) "The authentication threshold is low, meaning that the party seeking to introduce the disputed evidence need only demonstrate 'a reasonable likelihood that the evidence is authentic.' " *State v. Shropshire*, 2d Dist. Montgomery No. 28659, 2020-Ohio-6853, ¶ 11, quoting *State v. Yuschak*, 2016-Ohio-8507, 78 N.E.3d 1210, ¶ 16 (9th Dist.). "Ohio courts have * * * held that the determination of admissibility and authentication of social media evidence is 'based on whether there was sufficient evidence of authenticity for a reasonable jury to conclude that the evidence was authentic.' " *State v. Padgette*, 8th Dist. Cuyahoga No. 108525, 2020-Ohio-672, ¶ 13, quoting *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1222, 2015-Ohio-1679, ¶ 41 and 47. *Accord State v. Moore*, 10th Dist. Franklin No. 19AP-464, 2021-Ohio-1379, ¶ 56.

{¶ 28} Evid.R. 901(B) provides several examples of ways that the authentication

requirement can be satisfied. "The most common method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1)." *Leigh* at ¶ 40, citing *State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 34 (2d Dist.) and *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30. Therefore, "[t]he testimony of a witness with knowledge, among other things, satisfies this requirement." *State v. Weaver*, 2d Dist. Montgomery No. 27579, 2018-Ohio-2329, ¶ 18, citing Evid.R. 901(B)(1).

{¶ 29} As previously discussed, Entingh claims that the Snapchat videos screen recorded from the iPhone of Gibbs's former girlfriend, Chelsea Damico, were not properly authenticated and should not have been admitted into evidence at trial. In an effort to authenticate the videos, the State had Damico testify about Snapchat and the videos that she had screen recorded. During her testimony, Damico explained that Snapchat is a social media application that allows its users to send their friends photos and videos that disappear immediately after they are viewed. Damico testified that Snapchat also has a feature through which users can post photos and videos to their "story." Trial Tr. Vol. II, p. 262. Damico explained that a Snapchat story is "where all your friends on Snapchat can see what you're posting." *Id.* at 263. Damico also explained that, during the time in question, videos or images posted to a Snapchat story automatically disappeared after 24 hours and could not be replayed.

{¶ 30} Continuing, Damico testified that she and Gibbs had been "friends" on Snapchat, which allowed her to view the images and videos that Gibbs posted to his Snapchat story. Damico testified that on April 19, 2020, she went on Snapchat and viewed a portion of Gibbs's story at 11:30 p.m. and then went back on Snapchat and

watched the rest of Gibbs's story at 11:45 p.m. after she had finished getting ready for bed. The next morning, Damico learned that Gibbs had been killed in a car crash. After learning about Gibbs's death, she went back to Gibbs's Snapchat profile and screen recorded the videos that he had posted to his story the previous night. When asked how she did this, Damico testified: "On iPhones, there's an option where you can screen record your screen, and that's how I did it. I just screen recorded his whole story from the first Snap that was available in the morning, the first one I saw, to his last one about 11:17." *Id.* at 267.

{¶ 31} Damico testified that she had made the screen recording at 12:44 p.m. on April 20, 2020. Damico explained that the timestamps shown on the videos indicated that Gibbs had posted the videos to his story between 13 and 15 hours before she had made the screen recording. Damico testified that, with the help of her father, she provided the screen recording to the police. Damico then identified the Snapchat videos that were admitted into evidence and confirmed that they were the same videos that she had screen recorded on April 20, 2020.

{¶ 32} Entingh contends that Damico's trial testimony was insufficient to authenticate the Snapchat videos. Specifically, Entingh claims that Damico did not sufficiently describe how the Snapchat video system operated or how she went about screen recording the videos. Although there are currently no cases in Ohio that directly address the authentication of screen-recorded Snapchat videos, there are cases that discuss the similar act of taking screenshot images of content that is posted on social media applications.

{¶ 33} In *State v. Caslin*, 10th Dist. Franklin No. 17AP-613, 2018-Ohio-5362, the Tenth District Court of Appeals held that a screenshot image taken of a Facebook page by a criminal intelligence analyst was properly authenticated where the analyst testified that she found the Facebook page at issue on a public Facebook profile, took a screenshot of the Facebook page, and confirmed that the exhibit admitted into evidence was a true and accurate copy of the screenshot that she had taken. *Id.* at ¶ 20-22. The court explained that: "In the absence of evidence or contemporaneous objections that would support an inference that the screenshot photographs were contrived or altered, we find the evidence presented to have been both admissible and sufficient testimony in this case since the witness had knowledge the screenshot of the Facebook page was what it purported to be and could state what it communicated." *Id.* at ¶ 20

{¶ 34} In *State v. Croghan*, 2019-Ohio-3970, 133 N.E.3d 631 (9th Dist.), a school principal took screenshot images of posts made by a parent on a private Facebook group and on www.gofundme.com. *Id.* at ¶ 1-5, 11, and 13. In the posts, the parent had accused the school of lying about an alleged gun incident at the school. *Id.* The parent had been charged with inducing panic, and the principal's screenshots were admitted into evidence at trial. *Id.* at ¶ 5-6, and 11. The parent was ultimately convicted of the charge and then appealed her conviction on grounds that the principal's screenshots had not been properly authenticated. *Id.*

{¶ 35} On appeal, the Ninth District Court of Appeals rejected the parent's authentication argument based on the testimony that was presented at trial. *Id.* at ¶ 10, 14. Specifically, the court relied on the principal's testimony stating that she had taken

the screenshots in question and that the exhibits presented at trial accurately depicted those screenshots. *Id.* The court also considered the fact that the principal had provided the Facebook screenshots to the police the day after the parent made the posts. *Id.* at ¶ 10. In addition, the court relied on testimony from the investigating detective indicating that the parent had previously admitted to making the posts. *Id.* Based on the foregoing, the appellate court in *Croghan* found that the State had presented sufficient evidence from which the jury could have concluded that the screenshots were authentic, and thus it held that the trial court had not abused its discretion by admitting the screenshots into evidence. *Id.* at ¶ 10 and 14.

{¶ 36} In *State v. Howard*, 1st Dist. Hamilton No. C-170453, 2018-Ohio-3692, the First District Court of Appeals held that screenshot images taken of a victim's Facebook Messenger account had been properly authenticated under circumstances where the victim testified that she had logged into her Facebook account, taken screenshots of her Facebook account messages, printed off the screenshots, and then confirmed at trial that the screenshots admitted into evidence were the same screenshots that she had taken. *Id.* The appellate court in *Howard* also considered the fact that the defendant had not introduced any evidence establishing that the screenshots were not accurate depictions of the victim's Facebook account. *Id.* at 6, 17-18.

{¶ 37} The holdings in *Caslin*, *Croghan*, and *Howard* indicate that it is not necessary to provide testimony specifically describing the process by which a screenshot is taken in order to authenticate screenshots taken from a social media application. We see no reason why the similar function of screen recording a video from a social media

application should be treated any differently.

{¶ 38} In *Commonwealth v. Knight*, 100 Mass.App.Ct. 1130, 184 N.E.3d 818 (2022), the Appeals Court of Massachusetts held that a cell phone recording of a Snapchat video was properly authenticated under circumstances where the police officer who made the recording testified that "he viewed the video on Snapchat on June 6, 2017, and recorded it with his cell phone[.]" *Id.* at *3. In addition, "the parties stipulated to the timestamps depicted on the video recording which showed that the defendant [had] posted it to his account roughly one-half hour before [the police officer] made the recording." *Id.* at *4. Although it is unclear whether the officer in *Knight* used the screen-recording function on his cell phone to record the Snapchat video,[2] the fact remains that, for purposes of authentication, the court in *Knight* did not require testimony describing the specific process by which the officer used his cell phone to record the Snapchat video.

{¶ 39} Taking the aforementioned cases into consideration, we find that Damico's trial testimony satisfied the low threshold standard for authenticating evidence. Damico testified that she and Gibbs had been Snapchat friends, that she had personally observed the videos that Gibbs posted to his Snapchat story near the time of the collision, and that she had used her cell phone to screen record those videos between 13 and 15 hours after the videos were posted. In addition, Damico testified that she had provided the screen-recorded Snapchat videos to the police, and she confirmed that the videos admitted into evidence were the same videos that she had screen recorded. Moreover,

---

[2] It is possible that the officer used the video camera on his cell phone to record the Snapchat video while the Snapchat video was playing on a different device.

Entingh did not present any evidence indicating that the videos had been altered in some way or that the videos were not what they were purported to be.   Accordingly, we find that there was sufficient evidence of authenticity for a reasonable jury to conclude that the Snapchat videos were authentic.   Therefore, the trial court did not abuse its discretion by admitting the Snapchat videos into evidence.

{¶ 40} Entingh's first assignment of error is overruled.


**Second and Third Assignments of Error**

{¶ 41} Under his second and third assignments of error, Entingh contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.   We again disagree.

{¶ 42} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).   "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."   (Citations omitted.)   *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).   "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."   (Citations omitted.)   *Id.*

**{¶ 43}** In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 44}** In this case, Entingh was convicted of one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a) and two counts of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a). All of those offenses prohibit causing death or serious physical harm to another while operating a motor vehicle "[a]s the proximate result of committing a violation of [R.C. 4511.19(A)]." Pursuant to R.C. 4511.19(A)(1)(a): "No person shall operate any vehicle * * * within this state, if, at the time of the operation * * * [t]he person is under the influence of alcohol, a drug of abuse, or a combination of them."

{¶ 45} For his sufficiency argument, Entingh contends that there was insufficient evidence presented at trial establishing that he was: (1) operating the motor vehicle at the time of the collision and (2) under the influence of alcohol or drugs.[3]  We will address each of these arguments separately.

*1. Operating the Motor Vehicle*

{¶ 46} "The legislature has defined the term 'operate,' simply and unambiguously, as meaning 'to cause or have caused movement of a vehicle[.]'"  *State v. Burnett*, 2018-Ohio-109, 109 N.E.3d 61, ¶ 25 (2d Dist.), citing R.C. 4511.01(HHH).  In this case, the State presented a plethora of evidence establishing that Entingh was operating the vehicle at the time of the collision.  On the audio-recorded 9-1-1 call, Entingh responds affirmatively when the caller, Moore, asked if he was the driver of the vehicle.  *See* State's Exhibit 1.1.  In addition, Ofc. McKeever's trial testimony and the body camera video admitted into evidence established that Entingh eventually responded "yes, sir" when McKeever asked if Entingh had been driving.  *See* State's Exhibit 2; Trial Tr. Vol.

---

[3] Entingh also claims that there was insufficient evidence of recklessness.  We need not address that claim because the element of recklessness pertains to the two counts of vehicular assault that merged into his convictions for aggravated vehicular assault and to the single count of aggravated vehicular homicide under R.C.2903.06(A)(2)(a) that merged into his conviction under R.C. 2903.06(A)(1)(a).  *See State v. Rodgers*, 2d Dist. Montgomery No. 29403, 2023-Ohio-734, ¶ 85; *State v. Adkins*, 2d Dist. Clark No. 2019-CA-45, 2020-Ohio-3296, ¶ 8. " 'When a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' " *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).  Therefore, this court need only consider the counts for which Entingh was convicted and sentenced, i.e., aggravated vehicular homicide under R.C. 2903.06(A)(1)(a) and aggravated vehicular assault under R.C. 2903.08(A)(1)(a).  *See Rodgers* at ¶ 85.

I, p. 59. Ofc. McKeever's testimony and the body camera video also established that Entingh was the only occupant of the vehicle who was able to exit the vehicle after the collision, as Glandon, Reynolds, and Gibbs were discovered by McKeever in the vehicle's passenger seats. The fact that the driver's seat was the only empty seat in the vehicle suggested that Entingh, who exited the vehicle to get help, had been operating the vehicle.

{¶ 47} The Snapchat videos admitted into evidence and Glandon's testimony also supported the finding that Entingh was driving. Initially, the videos showed a female with shoulder-length hair driving and a male with short, buzzed-cut hair and a wristwatch on his right arm sitting in the front-passenger seat. As previously discussed, Glandon identified herself as the driver and Entingh as the front-seat passenger. Trial Tr. Vol. II, p. 305. Glandon testified that Entingh took over driving after the other occupants complained that she was driving too slowly. The later Snapchat videos supported this testimony, as they depicted a front-seat passenger with long hair and a driver who was wearing a wristwatch on the driver's right arm. In addition, Glandon identified Entingh as the individual who was driving in the later videos. In one of the last videos in which Entingh was driving, the vehicle's clock showed a time of 11:17 p.m., which was just minutes before the collision.

{¶ 48} When considering all the foregoing evidence in a light most favorable to the State, a reasonable jury could have concluded that Entingh had been operating the vehicle at the time of the collision.

### 2. Under the Influence of Alcohol and/or Drugs

{¶ 49} " '[B]eing "under the influence" of alcohol or intoxicating liquor means that the accused must have consumed some intoxicating beverage, whether mild or potent, and in such a quantity, whether small or great, that the effect thereof on him was to adversely affect his actions, reactions, conduct, movements or mental processes, or to impair his reactions, under the circumstances then existing so as to deprive him of that clearness of the intellect and control of himself which he would otherwise possess.' " *State v. Banks*, 2d Dist. Greene No. 2014-CA-11, 2014-Ohio-5360, ¶ 19, quoting *State v. Zimmerman*, 2d Dist. Montgomery No. 19528, 2003-Ohio-1551, ¶ 24, quoting *State v. Steele*, 95 Ohio App. 107, 111, 117 N.E.2d 617 (3d Dist.1952). "Being under the influence of alcohol has also been defined in Ohio as requiring a showing 'that the alcohol has impaired one's physical or mental self-control.' " *State v. Rogers*, 2d Dist. Montgomery No. 21208, 2006-Ohio-3516, ¶ 26, quoting *McKeehan v. Am. Family Life Assur. Co.*, 156 Ohio App.3d 254, 2004-Ohio-764, 805 N.E.2d 183, ¶ 12.

{¶ 50} In this case, the evidence presented at trial sufficiently established that Entingh had consumed alcohol and/or drugs prior to the collision. Vander Yacht testified to having observed Entingh at her apartment drinking beer, smoking marijuana, and taking a tablet of acid before Entingh left to go driving with Glandon, Reynolds, and Gibbs. The paramedic who assessed Entingh after the collision testified that Entingh admitted to having had two beers and two tabs of acid prior to driving. The State presented a cruiser camera video that showed Entingh admitting to smoking marijuana a few hours before the collision and to consuming two or three cans of beer an hour before driving. *See*

State's Exhibit 5.1. Tpr. Garner testified that he noticed Entingh had glassy eyes, dilated pupils, and smelled moderately of an alcoholic beverage while seated in the back of Ofc. McKeever's police cruiser. Viewing the foregoing evidence in a light most favorable to the State, we find that a reasonable jury could have concluded that Entingh had consumed alcohol and drugs prior to the collision.

{¶ 51} The determinative issue in this case, however, was not simply whether Entingh had consumed alcohol and/or drugs. The determinative issue was whether Entingh had been impaired, i.e., whether his ingestion of alcohol and drugs had adversely affected his actions, reactions, conduct, movements, or mental processes. Here, the responding officers' testimony and the body camera footage taken at the scene of the collision established that Entingh had been disoriented and had had difficulty answering simple questions. That said, the emergency room physician who treated Entingh testified that, although Entingh's CAT scan revealed no head injury, Entingh had facial injuries that indicated he had hit his head on something, which could have caused disorientation. Trial Tr. Vol. II, p. 215, 220-221. Therefore, while there was evidence that Entingh's mental processes had been impaired, there must also have been evidence indicating that the impairment was due to Entingh ingesting alcohol and/or drugs and not due to his hitting his head. *See State v. Wisecup*, 2d Dist. Montgomery No. 11400, 1989 WL 101143, *3 (Aug. 31, 1989) (insufficient evidence of driving under the influence where the officer could not rule out that defendant's slurred speech was caused by his head injury).

{¶ 52} Here, the paramedic who assessed Entingh testified that it was possible

that Entingh's condition had improved between the time she first arrived at the scene of the collision at 11:31 p.m. and the time that she assessed him in the ambulance at 12:43 a.m. *See* State's Exhibit 3; Trial Tr. Vol. II, p. 101, 107. The paramedic also testified that Entingh had been alert and oriented when she assessed him in the ambulance. The emergency room physician similarly testified that when Entingh arrived at the emergency room at 12:57 a.m., he was alert and oriented with normal pupils. Both the paramedic and the emergency room physician testified that when a person has a head injury, his or her condition rapidly deteriorates rather than improves, and that Entingh's condition did not suggest that he was suffering from a head injury. When viewing this testimony in a light most favorable to the State, a reasonable jury could have concluded that Entingh's improved condition throughout the night indicated that his initial disorientation was not the product of a head injury, but rather attributable to the effects of alcohol and/or drugs, the effects of which were wearing off over time.

{¶ 53} Regardless, the most significant evidence of Entingh's having been under the influence of alcohol and/or drugs was the collision itself and Entingh's driving. The Snapchat videos taken while Entingh was driving showed that just minutes before the collision, Entingh was driving at a high rate of speed, consistently crossing over the road's double-yellow-center line, driving on the wrong side of the road while negotiating sharp curves, accelerating quickly, and going airborne over a hill. *See* State's Exhibit 7.

{¶ 54} One of the State's collision reconstructionists testified that there had been no issue with Entingh's vehicle or any weather or road condition that had led to the collision. Although it was dark at the time of the collision, and although there were no

streetlights or ambient lighting illuminating the T-intersection where the collision occurred, the evidence established that that there had been two yellow stop-ahead signs just ahead of the intersection, two red stop signs on each side of the roadway at the intersection, and a yellow directional sign in the center of the intersection, all of which would have been illuminated by the headlights on Entingh's vehicle.

{¶ 55} The State's other collision reconstructionist testified that Entingh had been traveling 98 miles per hour *or greater* just 4.8 seconds prior to impacting the guardrail at the T-intersection. The collision reconstructionist also testified that the high-speed collision was due to Entingh's not reacting appropriately when he was presented with the stop signs at the intersection. More specifically, the collision reconstructionist concluded that:

> The cause of this collision was a combination of excessive speed the Lexus was traveling in conjunction with the driver's failure to react to the impending threat despite having been provided with ample warning. Regardless of the speed of the Lexus was traveling, had the driver of the Lexus responded in an appropriate and timely manner, this collision could have been avoided.

State's Exhibit 9.1.

{¶ 56} Entingh's own expert witness, Dr. Platt, testified that "when it comes to someone's perception of distance, their time to see a threat, to process a threat internally and react, whether that be hitting the accelerator, the break, turning left, right, all of that can be impacted by alcohol." Trial Tr. Vol. IV, p. 665.

{¶ 57} Upon review, we find that the quality of Entingh's driving shown on the Snapchat videos and Entingh's failure to appropriately and timely respond to the turn at the T-intersection despite there having been multiple warnings signs on the road suggest that Entingh's physical and mental processes were impaired while he was driving. Because there was also sufficient evidence establishing that Entingh had consumed alcohol and drugs prior to driving, when viewing the aforementioned evidence in a light most favorable to the State, we find that a reasonable jury could have concluded that Entingh was under the influence of alcohol and drugs at the time of the collision.

{¶ 58} For the foregoing reasons, we find that Entingh's convictions for aggravated vehicular homicide under R.C. 2903.06(A)(1)(a) and aggravated vehicular assault under R.C. 2903.08(A)(1)(a) were supported by sufficient evidence. After reviewing the entire record and weighing all the evidence and reasonable inferences, we also find that the jury did not clearly lose its way by finding Entingh guilty of those offenses, as the weight of the evidence supported the jury's verdicts. Accordingly, Entingh's convictions were not against the manifest weight of the evidence.

{¶ 59} Entingh's second and third assignments of error are overruled.


**Conclusion**

{¶ 60} Having overruled all of Entingh's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.